## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | :: | |
| | :: | **CRIMINAL ACTION FILE** |
| **v.** | :: | **NO. 1:18-cr-0217-MHC-AJB** |
| | :: | |
| **GREGORIO ALTAMIRANO RAMOS,** | :: | |
| | :: | |
| **Defendant.** | :: | |

### UNITED STATES MAGISTRATE JUDGE'S
### FINAL REPORT AND RECOMMENDATION

Defendant Gregorio Altamirano Ramos filed pretrial motions to suppress from evidence at his trial the fruits of (1) a warrantless search of a pickup truck on May 25, 2016 following a traffic stop on Interstate 10 ("I-10") near Biloxi, Mississippi, [Doc. 90], and (2) an April 27, 2017 warrant for geo-location data. [Doc. 91]. The Court held a hearing on the traffic stop, [Doc. 126 (hereinafter "T__")]. Ramos was directed to file a post-hearing brief addressing his standing to challenge the search of the pickup truck, which he did, [Doc. 128]. For the following reasons, the undersigned **RECOMMENDS** that the motions, [Docs. 90, 91], be **DENIED**.

## I.    BACKGROUND

Defendant is charged in a multiple count indictment[1] with conspiring to distribute and possess with intent to distribute at least one kilogram of heroin, at least five kilograms

---

[1]    Defendant also was charged with Ramon Lopez Jimenez, (#1), Juan Rodriguez Herrera (#2), and another individual.  Lopez entered a guilty plea and is awaiting sentencing,

of cocaine, and at least 500 grams of methamphetamine, in violation of 21 U.S.C. § 846 (Count One); conspiring to import into the United States a similar quantity of controlled substances, in violation of 21 U.S.C. §§ 960(b)(1) and 963 (Count Two); and conspiring to commit money laundering violations, in violation of 18 U.S.C. § 1956(h) (Count Three). Ramos also is charged with a substantive money laundering crime in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), (a)(2)(B)(i) and (ii), and 2 (Count Seven). [Doc. 1].

## II.   <u>EVIDENTIARY HEARING FACTS</u>

On May 25, 2016, Bruce Carver, Jr., was a captain in charge of the Criminal Interdiction Unit ("CIU") of the Harrison County Sheriff's Department in Gulfport, Mississippi.[2]  T10.  He was patrolling in a Dodge Charger equipped with lights and sirens, but he could not recall if the vehicle was otherwise marked as a police vehicle.  T13-14.[3] The vehicle also did not have a dashcam, nor was Carver equipped with a body camera. T14.  However, he was armed and in police uniform.  T14.   Over the course of his 13-year career with the CIU, Carver was involved in over 100 drug-trafficking cases.  T11.  He usually made 12 to 15 traffic stops per day.  T12.

_____

Rodriguez's case has been certified for trial, and the third individual has not been apprehended.

[2]      At the time of the evidentiary hearing, Carver was assistant chief of the Long Beach (Mississippi) Police Department.  T10.

[3]      Carver was transitioning from an administrative position back to patrol, so he still was in an "administrative vehicle."  T13.

That morning, Carver was watching traffic while parked on the shoulder on the westbound side of I-10 in the eastern part of Harrison County, between mile markers 48 and 39. T11, 13. This portion of I-10 was three lanes in each direction, and traffic was fairly heavy. T12, 15. Carver saw a white Dodge Ram pickup truck in the center lane traveling much slower than the flow of traffic, such that it was causing a bottle-neck behind it and other vehicles had to pass it on both sides. T15. Carver also saw the pickup drift from the center lane to the left lane as another vehicle was passing it on the left, and Carver did not see the pickup's driver signal an intent to change lanes. T16, 43-44. Those observations led Carver to suspect that the driver of the pickup was impaired. T16.

Carver turned on his blue lights, entered traffic, and stopped the pickup at mile marker 39 at 10:35 AM. T17, 44. Approaching the pickup on the passenger side, Carver saw that there were two occupants in the vehicle, and asked the driver for his license, registration, and proof of insurance. T17, 37. Through their identification documents, Carver learned that the driver was Francisco Ortiz and the passenger was Defendant Ramos. T17. Ortiz had an Illinois driver's license and Ramos had a Georgia identification card. T18. Ortiz was searching for the registration and insurance on the visor, and Ramos joined in by searching for that documentation in the glove compartment. T17. Carver described Ramos' looking for the vehicle's paperwork as "frantic," and stated that this caught his attention. T18, 35-36, 43.

3

Carver concluded Ortiz understood English because he followed Carver's commands that he gave in English.  T18.  Carver denied hearing Ramos having to translate for Ortiz. T18.  Ortiz stated, in English, that he borrowed the vehicle from his ex-wife, Marisol Hernandez, and that he could contact her to get the information Carver needed.  T19.  Ramos did not make any statements about ownership of the pickup.  T19.  Carver testified that Ramos did not ask why they were pulled over.  T36-37.

Carver saw that Ortiz had bloodshot eyes, so three to four minutes after stopping the vehicle, Carver asked Ortiz to relocate to the front seat of Carver's vehicle.  T19, 44.  Ortiz was not handcuffed, and Carver testified that Ortiz consented to sit in the front of Carver's vehicle.  T19.  Ramos remained seated in the pickup.  T20.

Once in the police vehicle, Carver began conducting checks through dispatch and over his cell phone as to Ortiz' and Ramos' criminal histories, their driver's licenses, and the pickup's tag number.  T45, 46.  Carver began writing out a courtesy citation while engaging in conversation in English with Ortiz.  T20-21.  He told Ortiz the reasons for the stop (driving too slowly and drifting into the other lane of traffic).  T37, 39.  Ortiz stated that his eyes were bloodshot and glassy because he had been driving since 4:00 AM that morning and had recently taken cold medication.  T20.  Ortiz also related that they were going to the beach at Galveston, Texas, but was he unable to state where or for how long they were staying.  T20.  To Carver, Ortiz' difficulty in answering these questions did not appear to be

4

due to any language barrier.  T38.  Carver also thought it was strange that they borrowed an older model manual-transmission work truck[4] to travel for 12 hours for a vacation.  T20-21.

While he was writing the courtesy citation for careless driving[5] and conversing with Ortiz, Carver learned through a response to his records queries that Ortiz, Ramos, and Hernandez (the vehicle owner) were currently under investigation by Homeland Security (HSI) for bulk currency offenses or drugs.  T21, 40.  He asked Ortiz for consent to search the vehicle.  T21-22.  Carver told Ortiz that he had the right to refuse or revoke consent and to stop him at any time.  Carver also told Ortiz that he had an English and Spanish consent form and asked him if he preferred English or Spanish, and Ortiz stated that he was more comfortable with Spanish.  T23, 38.  Carver presented Ortiz with the Spanish version of a consent form that Carver partially filled out in English.  T23; Govt. Ex. 1.[6]  Carver testified

---

[4]      The vehicle was a 2000 Dodge Ram 3500 pickup truck.  Govt. Exhs. 1, 3.

[5]      Miss. Code Ann. § 63-3-1213 provides as follows:

> Any person who drives any vehicle in a careless or imprudent manner, without due regard for the width, grade, curves, corner, traffic and use of the streets and highways and all other attendant circumstances is guilty of careless driving.  Careless driving shall be considered a lesser offense than reckless driving.

> Every person convicted of careless driving shall be punished by a fine of not less than Five Dollars ($5.00) nor more than Fifty Dollars ($50.00).

[6]      The preprinted English language version of the form provided in material part that "[i]n order to cooperate in an investigation being conducted by the Harrison County Sheriff's officer, I _____, residing at _____, do hereby voluntarily authorize

that Ortiz appeared to read the form, and then he signed it at 10:46 AM; Carver also signed it.  T23; Govt. Exh. 1.  While asking for consent, Carver used a calm voice and did not unholster his weapon, make any promises, or threaten Ortiz.  T24.  He asked Ortiz if he had any narcotics or large sums of money in the truck, and Ortiz took out his wallet and opened it, explaining that the currency and credit card inside were all he had for his trip.  T24.

By this time, Carver's backup (Lt. Hendry) arrived.  Ramos was moved to Hendry's vehicle's back seat, but the door was left open.  Ortiz remained in Carver's front seat.  T24-25.  Ramos and Ortiz weren't handcuffed.  T25.  Two other officers also arrived on the scene.  T26.

In a toolbox in the bed of the pickup truck, Carver located a backpack and an ice chest.  T27.  The ice chest contained a few drinks and some ice water but no real ice; however, there was condensation on the outside of the ice chest.  T27.  In Carver's experience, condensation on the outside of the ice chest is a sign that the insulation has been removed.  T27.  However, he did not want to pry open the cooler at this time, but instead continued the search.  Inside the truck cab, in the center of the front seat, he located latex gloves covered with spray foam, which foam in his experience is used to reseal an ice chest.  T41.  The

_____

_____ of the Harrison County Sheriff's Department to search my: _____ and its contents, which are owned or controlled by me and remove any items pertinent to their investigation.  No promises, threat, or coercion of any kind has been made against me by the Harrison County Sheriff's Department and I have been informed by the above named Deputy that I may refuse to consent to any search and that I may revoke my consent at any time."  Govt. Exh. 2.

officers also located construction adhesive behind the front passenger seat of the truck.  T41.

He then went back to the ice chest and inspected it further, and he noticed spray foam that

had been rubbed off as well as overspray.  T27-29; Govt. Exh. 10.

Carver then forcefully pried open the two layers of the ice chest, revealing vacuum-

sealed bags of U.S. currency.  T29.  The officers stopped searching and called the local DEA

Task Force office and DEA Task Force Officer Drace responded to the scene.  T29, 40-41.

Neither Ortiz or Ramos told the officers to stop searching, nor did either of them claim the

currency.  T29-30, 32.

The pickup truck, Ortiz, and Ramos were transported to the DEA office in Gulfport.

T30.  A total of $49,800 was located inside the lining of the ice chest.  T31.

## III.   DISCUSSION

### A.   MOTION TO SUPPRESS EVIDENCE FROM THE TRAFFIC STOP, [Doc. 90]

Ramos does not possess "standing"[7] to challenge the search of the pickup truck.  The

burden is on the defendant to establish a legitimate expectation of privacy, that is, that he

has standing to challenge a claimed Fourth Amendment violation.  *United States v. Chayes*,

---

[7]    The undersigned recognizes that the Supreme Court disapproves of the use of the word "standing."  *See Rakas v. Illinois*, 439 U.S. 128, 139-40 (1978); *see also United States v. Hawkins*, 681 F.2d 1343, 1344-45 (11th Cir. 1982).  However, the undersigned will use the word "standing" when referring to whether Ramos has a Fourth Amendment expectation of privacy because courts routinely use "standing" as "shorthand for the existence of a privacy or possessory interest sufficient to assert a Fourth Amendment claim." *See United States v. Daniel*, 982 F.2d 146, 149 n.2 (5th Cir. 1993).

169 F.3d 687, 690 (11th Cir. 1999).  The Fourth Amendment's protections extend to any thing or place with respect to which a person has a "reasonable expectation of privacy," *California v. Ciraolo*, 476 U.S. 207, 211 (1986) (quoting *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring)).  "By contrast, an individual's Fourth Amendment rights are not infringed—or even implicated—by a search of a thing or place in which he has no reasonable expectation of privacy." *United States v. Ross*, --- F.3d ----, ----, No. 18-11679, 2020 WL 3445818, at *4 (11th Cir. June 24, 2020) (en banc) (citing *United States v. Brazel*, 102 F.3d 1120, 1147 (11th Cir. 1997)).  Fourth Amendment rights are personal rights that may not be asserted vicariously.  *See Rakas v. Illinois,* 439 U.S. 128, 133-34 (1978).  An individual asserting Fourth Amendment rights "must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable[.]" *Minnesota v. Carter,* 525 U.S. 83, 88 (1998).  This is a threshold issue. *Ross, id.*

In *Rakas,* the Supreme Court held that the defendants did not have a legitimate expectation of privacy in the glove compartment or area under the seat in a car in which they were "merely passengers." *Rakas*, 439 U.S. at 148-49.  "Like the trunk of an automobile, these are areas in which a passenger *qua* passenger simply would not normally have a legitimate expectation of privacy." *Id.*  Thus, a "passenger usually lacks a privacy interest in a vehicle that the passenger neither owns nor rents, regardless of whether the driver owns it or rents it." *United States v. Cooper*, 133 F.3d 1394, 1398 (11th Cir. 1998).

8

Ramos argues that *Brendlin v. California*, 551 U.S. 249 (2007), changes this principle of law from *Rakas*.   [Doc. 128 at 2-3].   The Court rejects his argument for two reasons. First, *Brendlin* doesn't go as far as Ramos claims.  In *Brendlin*, the Supreme Court framed the issue solely as whether a traffic stop subjects a passenger, as well as the driver, to a Fourth Amendment seizure.  551 U.S. at 249.  The Court also remarked that in the courts below Brendlin did not challenge the search of the driver's vehicle, citing *Rakas*.  *Brendlin*, 551 U.S. at 252.  The Supreme Court in *Brendlin* concluded that a passenger, as well as the driver of a vehicle, are seized under the Fourth Amendment when a police officer subjects them to a traffic stop, not only when they are formally arrested.  As a result, the Court held, the passenger of a vehicle has standing to challenge the constitutionality of a traffic stop. *Brendlin*, 551 U.S. at 258-59.  But by citing to *Rakas* and noting that Brendlin was not challenging the search of the vehicle but only his seizure, the *Brendlin* Court didn't overrule or alter *Rakas*' holding about a vehicle passenger's ability to challenge the search of another's vehicle.

Second, with *Rakas* still being good law, the Court is bound by Eleventh Circuit precedent that holds that a passenger with no possessory interest in the vehicle lacks standing to challenge the search of the interior of that vehicle.  *United States v. Dixon*, 901 F.3d 1322, 1338-39 (11ᵗʰ Cir. 2018); *see also United States v. Lee*, 586 F.3d 859, 865 (11ᵗʰ Cir. 2009) ("Inasmuch as Lee asserted no property or possessory interest in the Lexus, he has failed to meet his burden of establishing a legitimate expectation of privacy in the glove compartment

in which the gun was discovered."); *United States v. Harris*, 526 F.3d 1334, 1338 (11th Cir. 2008) (per curiam) (holding that a "passenger[ ] in a private car, . . . who has no possessory interest in the automobile, does not have a legitimate expectation of privacy in the interior of the automobile because he does not have the right to exclude others from the car") (citing *Rakas*, 439 U.S. at 140, 134 n.12, 148); *see also Lewis v. United States*, 491 Fed. Appx. 84, 86 (11th Cir. Oct. 1, 2012) ("As for the March 2007 search, Lewis was a passenger and therefore only had standing to contest the vehicle stop.") (citing *Brendlin*, 551 U.S. at 251); *United States v. Ubaldo-Viezca*, 398 Fed. Appx. 573, 579 (11th Cir. Oct. 6, 2010) ("Although Ubaldo-Viezca appears to argue that . . . *Brendlin* . . . held that passengers have standing to challenge vehicle searches, *Brendlin* addressed a passenger's standing to challenge the constitutionality of the initial traffic stop, rather than the search of the vehicle in which he is riding. . . . Accordingly, the district court did not err in finding that Ubaldo-Viezca lacked standing to challenge the search of the Expedition and trailer.") (internal citations omitted).[8]

A passenger, of course, may challenge the search of his own property which is within the vehicle. *United States v. Barber*, 777 F.3d 1303, 1305 (11th Cir. 2015); *United States v.*

---

[8]     Eleventh Circuit Rule 36-2 provides that unpublished opinions are not considered binding precedent, but may be cited as persuasive authority. 11th Cir. R. 36-2. Unpublished opinions are not controlling authority and are persuasive only insofar as their legal analysis warrants. *Bonilla v. Baker Concrete Const., Inc.*, 487 F.3d 1340, 1345 n.7 (11th Cir. 2007) (citing *United States v. Rodriguez-Lopez*, 363 F.3d 1134, 1138 n.4 (11th Cir. 2004)).

*Delgado*, 903 F.2d 1495, 1502 (11th Cir. 1990); *United States v. McSwain*, No. 2:18-CR-20-FTM-29MRM, 2018 WL 5962429, at *5 (M.D. Fla. Nov. 14, 2018) ("[W]hile a mere passenger generally may not challenge the search of the vehicle, he may challenge the search of his own property which is within the vehicle.") (citations omitted). But Ramos has neither identified nor claimed any personal property taken from his person or the pickup truck that the Government seized, searched, and intends to introduce at trial. As a result, Ramos lacks standing to challenge the search of the pickup truck and the discovery of the ice chest, gloves, adhesive, foam, and the concealed currency.

The cases cited by Ramos do not alter this conclusion, if for the only reason that the Court is bound by the Eleventh Circuit precedent discussed above and not opinions of other circuit courts or district courts. *United States v. Veal*, 322 F.3d 1275, 1278 (11th Cir. 2003); *Fishman & Tobin, Inc. v. Tropical Shipping & Const. Co., Ltd.*, 240 F.3d 956, 965 (11th Cir. 2001). In any event, *United States v. Bah*, 794 F.3d 617, 626-27 (6th Cir. 2015), relied upon by Ramos, holds just the opposite to what Ramos claims. The Sixth Circuit in *Bah* recognized that "[c]ourts have routinely held that passengers who have no expectation of privacy or possessory interest in a stopped vehicle do not have standing to challenge the validity of a subsequent search of that vehicle on Fourth Amendment privacy grounds," holding that the defendant "may nevertheless contest the legality of his detention" because

"[p]assengers have standing to contest the lawfulness of their seizure." *Id.* (citing *Brendlin*, 551 U.S. at 251).[9]  Thus, *Bah* doesn't hold as much as Ramos wants it to.

Furthermore, the Court has been directed to no reported case, and has located none, which holds that *Brendlin* modified *Rakas* as it related to a passenger's standing to contest the search of another's vehicle.  In fact, all reported circuit cases that have expressly considered the issue have decided it contrary to Ramos's argument.  *See United States v. Spotted Elk*, 548 F.3d 641, 657 (8th Cir. 2008) (rejecting argument that *Brendlin* stands "for the proposition that a person who was a passenger in the past retains standing to challenge future searches of someone else's car"); *United States v. Diaz-Castaneda*, 494 F.3d 1146, 1150 (9th Cir. 2007) (noting that defendant lacked standing after *Brendlin* to challenge the search of another's car, but has standing to object to stop of the vehicle and request for his identification and license check, since "[t]h[o]se actions were directed at Diaz-Castaneda himself, rather than Diaz or Diaz's vehicle, and hence do not come under *Rakas*"); *United*

---

[9]      Ramos also relies upon *United States v. Mosley*, 454 F.3d 249, 253 (3d Cir. 2006), for the proposition that passengers in an illegally stopped vehicle have standing to object to the stop, and may seek to suppress the evidentiary fruits of that illegal seizure under the fruit of the poisonous-tree doctrine, including evidence seized from the vehicle.  [Doc. 128 at 3].  However, besides being contrary to Eleventh Circuit precedent, *Mosley* was decided before *Brendlin* and thus does not deal with whether a passenger with no independent privacy interest in a vehicle may challenge the search of that vehicle. Furthermore, *United States v. Bian*, CASE NO. 16–20026–CR–WILLIAMS/SIMONTON, 2016 WL 2342631 at *5 (S.D. Fla. Apr. 29, 2016), relied mainly upon pre-*Brendlin* cases, and the post-*Brendlin* case cited therein did not discuss *Brendlin*.  Therefore, the Court is not persuaded that *Bian* compels, much less suggests, a different result here.

*States v. Ellis*, 497 F.3d 606, 612 (6th Cir. 2007) (affirming district court's conclusion that defendant passenger lacked standing to challenge search of vehicle, only "evidence discovered as fruit of an unlawful detention"); *see also United States v. Martinez*, 537 F. Supp. 2d 1153, 1156 (D. Kan. 2008) (holding that a passenger's standing to object to search of vehicle remains subject to *Rakas* analysis, and citing *United States v. Cortez-Galaviz*, 495 F.3d 1203, 1206 (10th Cir. 2007)); *United States v. Ochoa-Mata*, No. CR 09-0146-TUC-FRZ(HCE), 2009 WL 2134357, *7 (D. Ariz. June 16, 2009) (noting defendant's standing to challenge stop of vehicle but not to challenge the search of the vehicle "because Defendant does not have a possessory or ownership interest nor a legitimate expectation of privacy in the silver sedan"); *United States v. Holmes*, No. 3:08-cr-129, 2009 WL 136684, *12 (E.D. Tenn. Jan. 16, 2009) (same); *United States v. Gaxiola-Burboa*, No. 06-8120, 2008 WL 4531689, *3 (D. Ariz. Oct. 9, 2008) (noting that *Brendlin* did not undermine *Rakas* because the *Brendlin* court specifically stated that Brendlin did not assert that his Fourth Amendment rights were violated by the search of the driver's vehicle); *United States v. Lewis*, No. 3:07-cr-112-J-33TEM, 2008 WL 552551, *5 (M.D. Fla. Feb. 27, 2008) (holding that defendant only had standing to challenge stop, not search, of vehicle). *But see United States v. Robinson*, No. 1:08-CR-74-TS, 2009 WL 2106147, *13 n.4 (N.D. Ind. July 13, 2009) ("The Court agrees with the Defendant that he has standing to challenge the search of the vehicle even though it was not his vehicle and he was not the

driver. *Brendlin* [ ] (ruling that a passenger is seized during a traffic stop and "may challenge the constitutionality of the stop).").

Thus, Ramos lacks standing to contest the search of the pickup truck and the undersigned **RECOMMENDS** that the motion to suppress, [Doc. 90], be **DENIED**.

Alternatively, should the District Court conclude that Ramos does have standing to challenge the search of the pickup truck, the suppression motion still is subject to being denied. The Fourth Amendment protects people against unreasonable government searches and seizures that intrude on their reasonable expectations of privacy. U.S. Const. amend. IV; *Florida v. Jimeno*, 500 U.S. 248, 250 (1991); *United States v. Place*, 462 U.S. 696, 706-07 (1983). Accordingly, a search or seizure must normally be conducted under the authority of a court-issued warrant, supported by a finding of probable cause to believe that evidence of a crime will be found in the targeted location. *Skinner v. Ry. Labor Execs' Ass'n*, 489 U.S. 602, 619 (1989); *Mincey v. Arizona*, 437 U.S. 385, 390 (1978). " '[S]earches conducted outside the judicial process . . . are *per se* unreasonable under the Fourth Amendment— subject only to a few specifically established and well-delineated exceptions.' " *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz*, 389 U.S. at 357 (footnote omitted); *see also United States v. Campbell*, 920 F.2d 793, 795 (11th Cir. 1991) ("A search without a warrant based on probable cause is illegal, unless the government can show that it falls into one of those limited exceptions recognized by law.").

14

"Upon a motion to suppress evidence garnered through a warrantless search and seizure, the burden of proof as to the reasonableness of the search rests with the prosecution. The [g]overnment must demonstrate that the challenged action falls within one of the recognized exceptions to the warrant requirement, thereby rendering it reasonable within the meaning of the fourth amendment." *United States v. Freire*, 710 F.2d 1515, 1519 (11th Cir. 1983) (citation omitted). The burden to establish the application of the warrant exception is by a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974) ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence.") (citing *Lego v. Twomey*, 404 U.S. 477, 488-89 (1972)). A preponderance of the evidence simply means an amount of evidence that is enough to persuade the Court that the existence of a fact is more probable than its non-existence. *Metropolitan Stevedore Co. v. Rambo*, 521 U.S. 121, 137 n.9 (1997); *see also United States v. 4 Meadowbrook Lake Condominium, Unit 308, Condominium # 8, Located at 314 SE 10th Street, Dania, Florida 33004*, No. 06-60079-CIV-COHN/SNOW, 2007 WL 809681, at *3 (S.D. Fla. Mar. 15, 2007) ("A preponderance of the evidence means that the United States 'must present an amount of evidence sufficient to persuade the court that the claim or contention is more likely true than not true.' ") (citing Eleventh Circuit Pattern Jury Instructions, Civil (2000), Basic Instruction 6 .1, Burden of Proof).

A so-called " *Terry* stop" is one such narrow exception to the warrant requirement. *See Terry v. Ohio*, 392 U.S. 1 (1968). A routine traffic stop is a limited form of seizure that

15

is more analogous to an investigative detention than a custodial arrest, and thus the legality of such stops is analyzed under the *Terry* standard. *United States v. Burwell*, 763 Fed. Appx. 840, 844 (11th Cir. Feb. 27, 2019) (citing *Terry*, *id.*; *United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001)). *Terry*, and the cases which have followed it, make clear that "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123-24 (2000); *United States v. Gordon*, 231 F.3d 750, 754 (11th Cir. 2000). "A traffic stop, which is a seizure within the meaning of the Fourth Amendment, is constitutional if it is either based upon probable cause to believe a traffic violation has occurred or justified by reasonable suspicion in accordance with *Terry*. . . ." *United States v. Spoerke*, 568 F.3d 1236, 1248 (11th Cir. 2009) (citations and quotation marks omitted). If there is not probable cause to believe a traffic violation has occurred, police officers may conduct a brief investigatory stop of a vehicle "if they have a reasonable, articulable suspicion based on objective facts that an individual is engaged in criminal activity." *Harris*, 526 F.3d at 1337 (quotation marks omitted). "A determination of reasonable suspicion is based on the totality of the circumstances," and the issue is "whether, given the circumstances, reasonable suspicion objectively existed to justify [the investigatory stop]." *Id.* at 1337-38 (quotation marks omitted).

Thus, law enforcement may seize an individual or vehicle for Fourth Amendment purposes when law enforcement has reasonable suspicion to believe that criminal activity is

16

afoot, (i.e., a *Terry* stop).  *See Terry*, 392 U.S. at 21-22; *United States v. Lee*, 68 F.3d 1267, 1270-71 (11th Cir. 1995) (noting that *Terry* applies to traffic stops).  There is a two-part inquiry for determining whether an investigative stop is reasonable: (1) whether the officers had reasonable suspicion to seize the individual; and (2) whether the stop was reasonably related in scope to the circumstances which justified the stop initially.  *United States v. Acosta*,   363 F.3d 1141, 1144-45 (11th Cir. 2004)   (citing   *United States v. Powell*, 222 F.3d 913, 917 (11th Cir. 2000)).  Reasonable suspicion can be formed while observing legal activity.  *Harris*, 524 F.3d at 1338.  The officer must "be able to point to specific and articulable facts, which, when taken together with rational inferences from those facts, reasonably warrant" the intrusion of a traffic stop.  *Terry*, 392 U.S. at 21.  The officer must pursue his investigation in a diligent and reasonable manner.  *See*, *e.g.*, *United States v. Sharpe*, 470 U.S. 675, 687 (1985); *see also Rodriguez v. United States*, 575 U.S. 348, 357 (2015).

When determining whether reasonable suspicion existed, a judge must review the totality of the circumstances to ascertain whether officers had a particularized and objective basis to suspect unlawful conduct.  *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *United States v. Torres-Bonilla*, 556 Fed. Appx. 875, 879 (11th Cir. Feb. 26, 2014).  The question is whether "the facts available to the officer at the moment of the seizure or search 'warrant a man of reasonable caution in the belief that the action taken was appropriate.' "  *United States v. Blackman*, 66 F.3d 1572, 1576 (11th Cir.1995) (quoting *Terry*, 392 U.S. at 22).  The

standard for both probable cause and reasonable suspicion is an objective one, and an officer's subjective motivation "does not invalidate what is otherwise objectively justifiable behavior under the Fourth Amendment." *Wren v. United States*, 517 U.S. 806, 812 (1996); *United States v. Simmons*, 172 F.3d 775, 778 (11th Cir. 1999).

Here, Carver had reasonable suspicion to stop the pickup truck and investigate the driver for careless driving under Miss. Code Ann. § 63-3-1213, as a result of observing that the pickup was impeding traffic and failed to signal as it appeared to change lanes. Ramos does not really argue otherwise. Rather, he challenges Carver's credibility, first, on the grounds that he did not have a body cam by pointing to a news article that the City of Biloxi Police Department had all of their officers wear body cams at least four months before the stop in this case. [Docs. 128 at 4 & n.3, 128-1]. However, even if not wearing a body cam undermines Carver's credibility, which it does not in this case, Carver was employed by the Harrison County Sheriff's Office and not the Biloxi Police Department.

Ramos also notes that Carver did not corroborate the slow driving speed by clocking the pickup's slow speed or riding behind or alongside the vehicle. However, under Mississippi law, an officer's observations are enough for him to determine that careless driving had taken place, *Henderson v. State*, 878 So.2d 246, 247 (Miss. Ct. App. 2004), as well as determinations of whether a speed violation occurred. *Evans v. State*, 93 So.3d 62, 64 (Miss. Ct. App. 2012); *see also* Miss. Code. Ann. § 63-3-603 ("Upon all roadways any vehicle proceeding at less than the normal speed of traffic at the time and place and under

18

the conditions then existing shall be driven in the right-hand lane then available for traffic, or as close as practicable to the right-hand curb or edge of the roadway, except when overtaking and passing another vehicle proceeding in the same direction or when preparing for a left turn at an intersection or into a private road or driveway."). *Cf. United States v. Monzon-Gomez*, 244 Fed. Appx. 954, 959 (11th Cir. Aug. 2, 2007) ("The Fourth Amendment plainly does not prohibit a law enforcement officer from pulling over a motorist for suspected speeding whenever the officer is acting solely on the basis of his visual observation. Stated differently, the Fourth Amendment does not require the use of radar detection to establish probable cause to believe a motorist is speeding").

He also contends that Carver made no attempt to determine if Ortiz was impaired, which was the reason that he pulled the pickup over. [Doc. 128 at 4]. The Court rejects this argument, first, because there was no evidence that the pickup was not in fact obstructing traffic or attempted to change lanes without signaling, and thus Carver's articulated reasons for stopping the pickup are credible. Second, the evidence demonstrates that Ortiz explained that he had been driving since 4:00 AM and had taken cold medicine, both of which support an inference that Carver in fact investigated Ortiz' possible impaired driving. As for Ramos's argument that Carver pulled the pickup over because it was occupied by Latinos, there is absolutely no evidence that supports that conclusion. Accordingly, the stop was lawful.

19

Further, Carver diligently performed his traffic-violation, did not unconstitutionally delay his investigation, and, therefore, lawfully asked Ortiz for consent to search. Even though Ramos makes no argument beyond the unlawfulness of the stop in challenging Ortiz' consent, the Court concludes that, based on the totality of circumstances surrounding the stop and Carver's interaction with Ortiz, the Government has established that Ortiz voluntarily consented to the search of the pickup truck. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *United States v. Triana*, 760 Fed. Appx. 768, 772-73 (11th Cir. Jan. 14, 2019).

As a result, even if Ramos has standing to challenge the search of the pickup truck, his motion to suppress the fruits of that search, [Doc. 90], should be denied.

## B.   MOTION TO SUPPRESS GEO-LOCATION WARRANT, [Doc. 91]

Ramos' second motion seeks suppression of the fruits of a geo-location warrant on the grounds that the Government failed to return the warrant or serve him with a copy for approximately 17 months after the issuing judge directed it to return the warrant and serve it upon the target. [Doc. 91 at 1-2]. The Government responded to the motion, [Doc. 98], and Ramos replied. [Doc. 105].

Federal Rule of Criminal Procedure 41(f)(1)(C) and (D) requires an officer executing a warrant for electronically-stored information to make reasonable efforts to serve a copy of the warrant and receipt on the person whose property was searched or who possessed the information that was seized or copied, and promptly return the warrant to the magistrate

20

judge designated on the warrant. The Government had until June 20, 2017 to return the warrant and serve it upon Ramos. [*See* Doc. 98-1 at 3; Doc. 98-2]. Ramos was indicted on June 13, 2018 and the indictment was sealed. [Docs. 1, 3]. The Government moved to extend the time to give notice and returned the warrant on November 27, 2018. [Doc. 98-2 at 2-9]. Ramos was arrested on the indictment in the Northern District of Florida on January 13, 2019, [Doc. 49], and ordered to be removed to this District on January 15, 2019. [Doc. 50 at 15]. He appeared in this District on February 1, 2019. [Doc. 52]. The Government notified him of the warrant when it produced discovery to his counsel on February 28, 2019. [Doc. 98 at 2; Doc. 98-3].

In is motion, Ramos does not claim to be prejudiced by the delay but rather claims that the Government blatantly disregarded the rule and therefore he is entitled to suppression of the fruits of the warrant. [Doc. 105 at 2-3].

Violations of Rule 41(f) "are essentially ministerial in nature and a motion to suppress should be granted only when the defendant demonstrates legal prejudice or that non-compliance with the rule was intentional or in bad faith." *United States v. Marx*, 635 F.2d 436, 441 (5th Cir. Unit B 1981)[10]; *see also United States v. Loyd*, 721 F.2d 331, 333 (11th Cir. 1983) ("[U]nless a clear constitutional violation occurs, noncompliance with Rule 41 requires suppression of evidence only where (1) there was 'prejudice' in the sense

---

[10]    Decisions by a Unit B panel of the former Fifth Circuit are binding precedent in the Eleventh Circuit. *Stein v. Reynolds Sec., Inc.*, 667 F.2d 33, 34 (11th Cir. 1982).

that the search might not have occurred or would not have been so abrasive if the rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the Rule.") (citations omitted); *see also United States v. Williams*, 871 F.3d 1197, 1202 (11th Cir. 2017) (same); *United States v. Gerber*, 994 F.2d 1556, 1560 (11th Cir. 1993) (same). In *Marx*, the court held that failure to deliver a copy of the search warrant to the party whose premises were searched until the day after the search did not invalidate a search, in the absence of a showing of prejudice. The *Marx* court went on to explain that in order to show prejudice in this context, a defendant must show that because of the violation of Rule 41, he was subjected to a search that might not have occurred or would not have been so abrasive had the rule been followed.

Ramos is not entitled to an evidentiary hearing on his motion. "[W]here a defendant in a motion to suppress fails to allege facts that if proved would require the grant of relief, the law does not require that the district court hold a hearing independent of the trial to receive evidence on any issue necessary to the determination of the motion." *United States v. Cooper*, 203 F.3d 1279, 1285 (11th Cir. 2000) (quoting *United States v. Sneed*, 732 F.2d 886, 888 (11th Cir. 1984)). Although he alleges that the length of the delay demonstrates bad faith or disregard of the Rule, that allegation is not supported by any factual basis. He contends that at the time of the execution of the geo-location data warrant, agents showed up at Ramos' place of business, that he was aware of a poll camera watching his business, and that he was not arrested for almost two years after the warrant was

22

executed; and that despite his knowledge that he was being investigated, he did not flee. [Doc. 105 at 2-3].  But these allegations of fact do not raise an issue of bad faith, only negligence by the Government.  Probable cause in support of the search warrant for geo-location data was not affected by the delay, nor does he allege that the Government withheld notice in order to undermine or prejudice his defense or that the delay in giving him notice deprived him of the use of any of his property.  *Compare United States v. Mitchell*, 565 F.3d 1347, 1351 (11th Cir. 2009) ("[T]he detention of the hard drive for over three weeks before a warrant was sought constitute[d] a significant interference with Mitchell's possessory interest.").  Instead, he claims without support that the delay "shows a blatant disregard for the rules, and ultimately the rights of Mr. Ramos."  [Doc. 105 at 3].

"A motion to suppress must in every critical respect be sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that a substantial claim is presented. . . . A court need not act upon general or conclusory assertions. . . ."  *Cooper*, 203 F.3d at 1284 (quoting *United States v. Richardson,* 764 F.2d 1514, 1527 (11th Cir. 1985) (internal citations omitted)).  Here, the evidence before the Court is that the Government moved to extend service of notice in November 2018 until February 25, 2019, based on an internal review of the case file and before Ramos was arrested.  [Doc. 98 at 5].[11]  The

---

[11]     The Government offers no explanation for why it did not give notice to Ramos on February 25, 2019, the extended time granted by the issuing judge, and instead gave notice three days later, on February 28, 2019.  Nonetheless, Ramos does not claim that the additional three-day delay was independently unlawful.  In any event, the same reasoning

monitoring of the geo-location data ended at the time authorized by the issuing judge.  It is significant that the case upon which the Eleventh Circuit relied in establishing the rule in *Loyd*, that is *United States v. Stefanson*, 638 F.3d 1231, 1235 (9th Cir. 1981), concluded in that case that where the Rule 41 violation "was neither deliberate nor prejudicial, only technical, and since the warrant was supported by an oath of the affiant, the Fourth Amendment warrant requirement was substantially satisfied."  In the present case, the mere delay, even lengthy, does not show that the Government intentionally or purposefully violated the rule, and thus no evidentiary hearing is warranted and Ramos' motion is due to be denied.

Accordingly, the undersigned **RECOMMENDS** that Ramos' motion to suppress geo-location data, [Doc. 91], be **DENIED**.

## IV.    CONCLUSION

For all of the above and foregoing reasons, the undersigned **RECOMMENDS** that Ramos' motions to suppress, [Docs. 90, 91], be **DENIED**.

The Court has now disposed of all matters referred to it pursuant to Standing Order 14-02 (N.D. Ga. Aug. 15, 2014).  Further, the Court has not been advised of any impediments aside from the ongoing pandemic and resultant Emergency Orders to the

---

employed by the Court in rejecting the 17-month delay in the Government first seeking an extension of the notice requirement applies to this additional three-day delay.

scheduling a trial of the charges against Ramos.   Therefore, the case as to him is **CERTIFIED READY FOR TRIAL**.

   **IT IS SO RECOMMENDED AND CERTIFIED**, this the 29th day of June, 2020.

_____
ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE